Mr. Justice CLIFFORD
 

 delivered the opinion of the court.
 

 This- case is brought here by appeal from a decree of the Circuit Court of the United States for the Southern District of New York, sitting in admiralty.
 

 Appellants were the insurers of the brig Jeremiah Fowler, which was lost on the 24th day of August, 1855, while on a voyage from the port of Philadelphia to the port of Boston., Allegations of the libel are, that she was loaded with coal, and-that after she had arrived,in Block Island-channel, and while she was beating in towards Yineyard Sound, she was negligently and wrongfully run into- by the .brig Morning
 
 *554
 
 Light and sunk, and that the vessel, together with the cargo, became a total loss. Libellants insured the vessel in the sum of thirteen thousand dollars; and having paid the whole amount, they instituted this suit against the Morning Light' to recover the value of the vessel, upon the ground that the vessel of the respondents was in fault, and that the collision was occasioned by the negligence and want of proper.care and precaution of those who had the charge and management of her deck at the time the collision occurred. Respondents allege that the Morning Light was bound on a voyage from Philadelphia to Portland, and that she was well manned, tackled, and provided. Collision occurred, as the respondents allege, about four o’clock in the morning; and they also allege, that at the time it occurred it was raining heavily, and that in consequence of a dense fog it was intensely dark.
 

 Parties agree that the collision occurred at the time specified in the answer; and the respondents also allege that the wiud, at the time, was from the eastward, say east by north, and that their vessel was heading about north by east. Undoubtedly she was on her starboard tack, elosehauled on the wind, and like the vessel of the'libellants was beating into Block Island channel. Such was the state of things when, as the respondents allege, the lookout on their vessel first discovered the vessel of the libellants, and the concurrent- testimony of those on board their vessel is that the vessel so discovered, appeared to be crossing the bows of the Morning Light. When the lookout made that discovery he immediately gave the order to the man at the wheel to put her helm hard up; but the allegation is that the two vessels were so near together that it was not possible to prevent the collision. Appellants also allege that their vessel had a competent lookout properly stationed on her deck, and that the vessel was discovered as soon as it was possible to discern her in the dense fog with which she was surrounded.
 

 Suit was commenced in the District Court, and after a full hearing, the district judge entered a decree dismissing the libel, upon the ground that the collision was the result of
 
 *555
 
 inevitable accident. Appeal was taken by the libellants tc the Circuit Court, and the respective parties were again heard in that court; and, after full consideration, the decree of the District Court was in all things affirmed, and upon the same' ground as that assumed in the District Court. Whereupon the libellants appealed to this court, and now seek to reverse the decree, upon the ground that both the courts below were in error.
 

 1. Appellants contend, in the first place, that their vessel was ahead, and that the other vessel, inasmuch as she was coming up, was bound to keep out of the way. Secondly, they contend that the vessel of the respondents was also in fault, because she did not have a competent lookout properly stationed on the vessel. Thirdly, that she was also in fault, because she did not shorten sail and diminish her headway. On the other hand, the defence is placed chiefly upon the ground set up in the answer, that the collision was the result of inevitable accident; but the respondents also contend that the vessel of the libellants was in fault, because she' unnecessarily attempted to go about and change her course while she was under the bows of the Morning Light.
 

 Beyond question the vessel of the libellants was ahead at nightfall before the collision occurred, as the evidence shows that she was seen at that time by the master of the Morning Light, and he testifies that she was to the windward, and five or six miles ahead. The. evidence also shows that she was at that time heading north-northeast, and the witnesses say that she was apparently sailing faster than the vessel of the respondents, and that both vessels were sailing on the same tack. Suggestion of the respondents is, that she had changed her course during the night, and some time before the collision, and that she was sailing, at the time it occurred, on the .larboard or port tack; and it must be admitted that the position of the respective vessels at that time, and the attending circumstances, give some countenance to that theory. But the- testimony of the witnesses for the libel-lants is directly the other way, and as there is nothing in the case of a positive character to contradict their state-
 
 *556
 
 merits, it must be assumed that they are correct, although it is very difficult to see how it happened that the two vessels came together as alleged, unless one of them had changed her course..during the night. Theory of the libellants is that their vessel had
 
 just come about
 
 on to the larboard tack, and that her sails had not filled sufficiently to give her headway, and the theory is essential to the libellants’ case, because if their vessel was fully under way on that tack, and in a situation to do so, it would have been her duty to port her helm and give way. Suffice it to say, however, the proof is clear that she
 
 was not under headioay,
 
 and perhaps the better opinion from the evidence is that she had just come about, as is assumed by the libellants, and not that her sails were merely aback through the fault of the helmsman, as is assumed by the respondents:
 

 II. Assuming the fact to be so, then it follows that the vessel of the libellants was not in fault, and the question of liability must chiefly depend upon the defence set up in the answer, that the collision was the result of inevitable accident. Examples are to be found in the reported cases whAre collisions have occurred exclusively from natural causes, and without any negligence or fault, cither on the part of the owners of the respective vessels, or of those intrusted with their care and management, and where the facts are so, the rule of law. is that the loss must rest where it fell, on the principle that no one is responsible for such an accident. Such was the ruling of the court in the case of the steamer Pennsylvania,
 
 *
 
 and we have no doubt that the ruling was correct. Ruling of the court in the case of the John Frazer
 
 †
 
 was to the same effect. Remarks of the court in that case were, that the mere fact that one vessel strikes and damages another docs not of itself make her liable for the injury; but the collision must in some degree be occasioned by her fault. A ship properly secured may, by the violence of a
 
 *557
 
 storm, be driven from her moorings and forced against another vessel, in spite of her efforts to avoid it; yet, says the court, she certainly would not be liable for damages which .it was not in her power to prevent. So, also, ships at sea may, from storm or darkness of the weather, come in collision with one another without fault on either side; and in that case, say the court, each must bear its own loss, although one is much more injured than the other. "Where negligence or fault, however, is shown to have been committed by cither party, the rule under consideration can have no application, for if the fault was one committed by the respondent alone,_ then the libellant is entitled to recover; or if by the libel-lant alone, then the libel must be dismissed; or if both vessels were in fault, then the damages, under the rule applied in this court, must be apportioned between the offending véssels.
 

 III. Before considering the defence, therefore, it becomes' necessary to inquire and determine whether it be true, as is supposed by the libellants, that the vessel of the respondents was in fault. Their theory is that their vessel was ahead, and that the vessel of the respondents was bound to keep out of the way. Granting the fact to be as assumed, still if it was so dark that the vessel ahead could not be seen, the vessel- astern cannot be held to bo in fault for not complying with that rule, unless she was improperly in that position, or was guilty of some negligence or want of care and precaution.
 
 *
 

 Chai’gc of the libellants is, that she had no lookout, and the charge, under the circumstances, is one that deserves to be very carefully considered. Proofs are full -to the point, that two of her company, the mate and a seaman, were assigned to that duty; but the question is whether they were properly stationed, on the vessel. Burden of the vessel was two hundred and sixty-nine tons, and the ship’s company consisted of the master, two mates, the cook, and four men before the mast. . According to the evidence, the vessel was
 
 *558
 
 laden with lumber, and her deck load consisted of three tiers of spars about as high as the bulwarks. She had a good light in her forestays eight feet above the main deck, and she had an experienced seaman at the wheel. One lookout was stationed on the larboard side, eight or ten feet forward of the mainmast; and the mate, who was also on the lookout, was on the starboard side, just forward of the foremast; and it should be remembered that the vessel was upon the starboard tack. None of these facts are successfully controverted; but the argument is, that the lookouts were not properly stationed, and it is not to be denied that, in general, some position farther forward would be a better one to secure the object for which lookouts are required.
 

 IY. Reference, however, must in all cases be had to the circumstances, and especially to the course of the respective vessels, and to their bearing in respect to each other. Considering the situation of the vessel of the libellants, assuming it to be such as the libellants suppose, it is by no means certain that the position of the lookout on the larboard side was not as favorable to discover the vessel of the libellants, when
 
 she went into stays and came about
 
 as could have been chosen, and it is quite clear that the position of the mate while his vessel had her starboard tacks aboard was one without objection. They both testify that they were attending to their duty, and there is no ground for doubt that they would have seen the other vessel in season to have avoided the collision, but for the intense darkness of the night.
 

 V. Fault is also imputed to the Morning Light by the libellants, because she did not during the alleged intense darkness “ lie to,” or shorten sail and check her headway. Steamers navigating in thoroughfares are always required, whenever the darkness is such that it is impossible or difficult to see approaching vessels, “to slow” their engines or even to stop or back, according to the circumstances, and no reason is perceived why the principle of the rule in that behalf may not be applied in a qualified sense to sail véssels where they are navigating in crowded thoroughfares, and when the darkness is so intense that vessels ahead cannot be
 
 *559
 
 seen.
 
 *
 
 Decisions to that effect may be found, and no doubt they are correct, as for example, it was held in the ease of the--Virgil,
 
 †
 
 that the defence of inevitable accident could not be maintained where it' appeared that the vessel setting it up was sailing with a strong breeze and under a full press of canvas and with her studding-sails set, although it appeared that it was very dark and hazy at the time of the accident.
 
 ‡
 
 But such a restriction can hardly be applied to sail vessels proceeding on their voyage in an open sea. On the contrary, the general rule is that they may proceed on their voyage although it is dark, observing all the ordinary rules of navigation, and with such additional care and precaution as experienced and prudent navigators usually employ under similar circumstances. They should never under such circumstances hazard an extraordinary press of sail, and’in case of unusual darkness, it may be reasonable to require them when navigating in' a narrow pathway, where they are liable to meet other vessels, to shorten sail if the wind and weather will permit.
 

 The weight of the evidence in this case shows, that the wind during the greater portion of the night was perhaps a five or six knot breeze, but it is highly probable that it. was much lighter during the fog showers and the period of the extreme darkness which immediately preceded the collision. Neither vessel had any studding-sails, nor any greater press of canvas than is usual in such a voyage, nor is it by any moans certain that.either had arty more sail set than was re; lonably necossai-y to keep the full control and proper management of the vessel. They both had competent officers on deck, good lights in the rigging, and as wo think sufficient lookouts, and it appears that neither was guilty of any negligence or utiskilfulness.
 

 Some of the witnesses for the libellants deny that the night was as dark .as is represented by the witnesses examined by the respondents, but those denials came chiefly
 
 *560
 
 from those who signed the protest, shortly after the disaster, which in substance and effect confirms the. respondents’ witnesses, and fully justifies the finding in that behalf in the court below. Reasonable doubt cannot be entertained that it was intensely dark at the .time of the collision. Loth the courts below were of that opinion, and we fully concur in that view of the case, and think it sufficient under the circumstances to express that concurrence without reproducing the evidence.
 

 VI. Reported cases where it has been held that collisions occurring in consequence of the darkness of the night, and without fault on the part of either party, are to be regarded as inevitable accidents are numerous, and inasmuch as there is no conflict in. the adjudications, it is not thought necessary to do much more than to refer to some of the leading cases upon the subject.
 
 *
 
 Where the loss is occasioned by a storm or any other
 
 vis
 
 major, the rule as established in this court is that each party must bear his own loss, and the same rule prevails in most other jurisdictions.
 
 †
 
 Different definitions arc given of what is called an inevitable accident, on account of the different circumstances attending the collision to which the rule is to be applied.
 

 Such disasters sometimes occur when the respective vessels are each seen by the other. Under those circumstances, it is correct to say that inevitable accident, as applied to.such a ease, must be understood to mean a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident.
 
 ‡
 
 When applied to a collision, occasioned by the darkness of the night, perhaps a more general definition is allowable. Inevitable accident, says Dr. Lushington, in the case of
 
 The Europa,
 

 §
 

 must be considered as a relative term, and must,
 
 *561
 
 be construed not absolutely but reasonably with regard to the circumstances of each particular case. Viewed in that light, inevitable accident may be regarded as an occurrence which the party charged with the collision could not possibly prevent by the exercise of ordinary care, caution, and maritime skill.
 
 *
 
 Regarding these cases as sufficient to show that a collision resulting from the darkness of the night and without the fault of either party, is properly to be regarded as an inevitable accident, we forbear to pursue the investigation, and wish only to add that we have no doubt the case was correctly decided in the Circuit. Court.
 

 The decree of the Circuit Court is therefore,
 

 Affirmed with costs.
 

 *
 

 Union Steamship Co.
 
 v.
 
 New York Steamship Co., 24 Howard, 313.
 

 †
 

 Owners of Brig James Gray
 
 v.
 
 Owners of Ship John Frazer, 21 Howard, 194.
 

 *
 

 The Shannon, 1 W. Robinson, 463.
 

 *
 

 The Rose, 7 Jurist, 381.
 

 †
 

 Id. 1174.
 

 ‡
 

 The Virgil, 2 W. Robinson, 202.
 

 *
 

 Stainbach et al.
 
 v.
 
 Rae et al , 14 Howard, 538.
 

 †
 

 1 Parsons' Merc: Law, 187; Woodrop Sims, 2 Dodson, 85; The Itinerant, 2 W. Robinson, 243.
 

 ‡
 

 The Locklibo, 3 W. Robinson, 318; The Pennsylvania, 24 Howard, 313.
 

 §
 

 2 English Law & Equity, 559.
 

 *
 

 The Virgil, 1 W. Robinson, 205; The Juliet Erskine, 6 Notes of Cases, 634; The Shannon, 1 W. Robinson, 463; Same Case, 7 Jurist, 380.