### THE METIS.

#### (Circuit Court of Appeals, Fourth Circuit. May 4, 1915.)

#### No. 1288.

COLLISION ☞96—VESSELS IN HARBOR—STEAMSHIP AND LIGHTER.

A collision occurred in the daytime in Havana Harbor between the steamship Metis, which had just left her loading berth and was passing out between two anchored steamships, which was the only practicable passage, and the sail lighter General Prim, which appeared from the opposite side of one of such steamships which it was unloading. *Held,* on the evidence that the Metis was proceeding at slow speed, gave all proper signals to warn boats which might be expected to be unloading the other vessels of her approach, and did all that was possible to avoid collision after the General Prim was seen, and that she was not in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 203–205; Dec. Dig. ☞96.]

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddell, Jr., Judge.

Suit in admiralty for collision, by the Mannheim Insurance Company, Fireman's Fund Insurance Company, and others against the steamship Metis, W. D. Henry, master and claimant. Decree for respondent, and libelants appeal. Affirmed.

For opinion below, see 212 Fed. 798.

T. Catesby Jones, of New York City (Harrington, Bigham & Englar, of New York City, on the brief), for appellants.

Charles R. Hickox, of New York City (Convers & Kirlin, of New York City, Hughes, Little & Seawell, of Norfolk, Va., and William H. McGrann, of New York City, on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and CONNOR, District Judge.

CONNOR, District Judge. Libelant, Mannheim Insurance Company, alleges that on the 20th day of March, 1912, the steamship Metis, while passing out of the harbor of Havana, Cuba, ran down and sunk the lighter General Prim, loaded with merchandise, the property of Menendez & Co. and Platt & Co., of Havana; that the owners assigned their interest in the property, and their claim to libelant. The Fireman's Fund Insurance Company also filed a libel, alleging the same facts and the assignment of the claim of Balleste Foyo Company, of Havana. Both libels charged that the collision was due to the negligence of the steamer Metis, in that: (1) The steamer failed to keep out of the way of the lighter, General Prim, as required by the rules of navigation; (2) that said steamer, having the said lighter on her starboard side, failed to keep out of the way; (3) that said steamer maintained no sufficient lookout; (4) that said steamer failed seasonably to stop and reverse; (5) that said steamer took no precautions to avoid the collision after the damage had become apparent.

The master and claimant of the Metis, answering the libels, admitted the collision and loss of the lighter and her cargo, but denied the allegations charging negligence. The libels were filed, and the Metis seized while in the jurisdiction of the District Court for the Eastern District of Virginia. The judge found the following facts: The Metis had been anchored in the harbor of Havana, Cuba, taking on a cargo. The steamers Kronprinzessin Cecilie, the Havana, of the Ward Line, and a Spanish mail steamer were severally at anchor lower down in the harbor, and at a point slightly below the San Francisco wharf, or pier, which extended out some distance into the channel. They were all large vessels, the Havana, a large passenger and freight steamer, with a superstructure which almost obstructed the view of outgoing craft on the inland side of her; all three vessels were trailing across the channel under the influence of a northeast wind, nearly filling the entire passageway. The Spanish ship was furthermost to the starboard side of the channel, the Havana slightly to the southward and westward of her, and the Kronprinzessin Cecilie slightly to the southward and westward of the Havana. A short time prior to the collision, the Metis, a ship some 340 feet long, which had been taking on a cargo of sugar for three or four days, raised anchor and proceeded down the harbor, intending to pass out to sea, between the Cecilie and the Havana. When approaching, and about to pass under the stern of the Havana, the General Prim, a sail lighter engaged in unloading freight from the Havana, to be taken to the dock, piled high with boxes, emerged from behind and on the port side of the Havana, and but a short distance therefrom, coming into collision with the Metis, as a result of which the General Prim was sunk. The judge reached the conclusion that the Metis was not negligent in any of the respects specified in the libels, and that she was not in fault in failing to give due and timely signals, indicating that she had raised her anchor and was moving down the channel, and dismissed the libels. A num-

ber of errors are assigned in the record. In the brief and upon the oral argument, while none of them were specifically abandoned, appellants relied principally upon the contention that the Metis failed to give the signals of her approach prescribed by the navigation rules of the harbor of Havana and the general rules of navigation. This contention is based, to a large extent, upon the testimony tending to show that "those in charge of the Metis, as she was passing out of the harbor, well knew that a lighter might, at any time, leave the side of the steamship Havana as the Metis approached her," and that therefore it was their duty to give a signal of one prolonged blast of her whistle upon approaching a vessel anchored in the position occupied by the Havana. This contention is stated in the brief. "The court erred in finding that the Metis was free from fault because she gave due and timely signals, indicating that she had raised her anchor." Appellee insists that this point is not open to appellant because not specified in the libel. In this we do not concur—the question is presented by the evidence, and specifically passed upon by the District Judge. It is true that, not having been alleged in the libel, appellee's witnesses, in their depositions taken at Norfolk, where the Metis was libeled, were not fully interrogated upon that point. Passing the objection raised by the appellee, in that respect, we proceed to examine the evidence, upon which the finding of the judge is based.

Jose Pomares y Guerra, witness for appellee, says:

That he was the pilot in charge of the Metis, at the time of the collision. "We were going out with the steamer, we were whistling with the usual precautions, and while we were passing in front of the German steamer, Kronprinzessin Cecilie, and behind the stern of the American steamer Havana, there being no other channel, there came out from the port side of the American steamer a loaded launch without sails and, for this reason, out of control, and the steamer Metis had to reverse and drop her port anchor. The launch struck up against the starboard side of the Metis. We had no other way to go through. I was on the bridge beside the captain, giving orders to the captain, when he was to pass. We were proceeding at about two miles an hour. The engines had just enough steam to give steerage way to the vessel * * * I could not say how many times the whistle of the Metis was blown, but it was several times."

Upon cross-examination, he says:

That he has a license issued by the Treasury Department. "The rules in force are the rules adopted by the Cuban government since the American intervention. These rules are the International Rules." He saw that the Havana was unloading. "It was very likely that a launch or lighter would be coming out from the far side of the steamer, the same launch, the General Prim. At any moment it might be possible for a launch to come away with the due precautions. It is customary to blow the whistle on going through any such channel. The Metis had one whistle—blew several times, because there was a good deal of traffic, and a lot of boats in the bay. * * * We blew for the first time when we took up the anchor. It was two or three minutes after we blew the last signal before the General Prim came out from under the stern of the Havana."

John O'Brien, witness for appellee, says:

That he has been a pilot in, or about, Havana, nine years. "Vessels at anchor are always attended by lighters, either loading or unloading. It is safe to assume that, at any time there is likely to be a lighter running from the side of one of these ships to the shore. You can never tell when one will

shove off from the ship to the shore. I always take great precaution in passing these ships for fear of a lighter darting out. I always go slow. We are obliged to blow the whistle anyway. If a vessel is proceeding to sea with one of the harbor pilots on board, we are obliged to, and we surely do, blow the whistle, as we approach steamers at anchor, so as to give any lighters that may be on the other side warning of our intention to pass through. The International Rules of Navigation are supposed to be in force here. * * * The usual signal that is blown as a notice to lighters on the far side of the vessel is a long, single blast."

This testimony establishes libelant's contention that it was known, or should have been known, to those in charge of the Metis, as she approached the passageway made by the steamships lying at anchor, that a lighter might, at any moment, come out from under the stern of the Havana, and that the duty was imposed upon them to give the signals usually, or by the Rules of Navigation, in force in the harbor, required to be given. No rules were introduced. The foregoing is all of the evidence found in the record in that respect. It may be conceded that the duty is imposed upon the appellee to show that those in charge of the Metis, in respect to giving the signals, discharged their duty.

Considered from this point of view, any suggested negligence on the part of the Havana or the General Prim is irrelevant. The pertinent inquiry is whether the Metis was at fault in respect to giving the usual signals, as she raised her anchor and approached the Havana. The principal testimony bearing upon this inquiry comes from the witnesses examined at Havana. John O'Brien, who appears to be disinterested, says:

That he was on the end of the pilot wharf, called "Recreation Pier." "After I heard the ship's whistle blowing, I looked around to see our boat go off, as I was satisfied that the whistle was for our boat to go off to take the pilot out, and I saw the ship swinging around. * * * I first noticed the Metis that afternoon by her blowing the whistle. I could not say exactly when she blew her whistle. It was a long whistle, as far as I recollect. It was a general alarm they blow for the pilot to come out."

On cross-examination, he says:

"The usual signal that is blown as a notice to lighters on the far side of the vessel is a long, single blast."

We have quoted the testimony on this point of the pilot Pomares. Thomas Abbott, a witness for claimant, who was not on the Metis, and appears to have been disinterested, says:

"I heard her blow her whistle two or three times, as she approached—blasts of the whistle. I did not notice any other signals, but I noticed the steamer whistling as she came out. She was coming towards me; this was before the collision."

Edmund J. Frederick, who does not appear to be interested, says that he did not see the collision, but saw the vessel before and after—he did not see the Metis get under way—after she got under way he heard the whistle, two or three times. He says:

"As she proceeded, I heard her whistle two or three times. I thought that she was whistling for the boat to come out to take off the pilot; that was before the collision."

This is all of the affirmative testimony taken by the appellee at Havana upon the question of signals.

Menendez, libelant's witness, who was in charge of the General Prim, at the time of the collision, says:

"I was coming from the port side of the steamer Havana, and going to the general wharves. When I left the port side of the Havana I did not see anything, but afterwards I saw the steamer Metis, about two blocks from us, when she commenced to whistle and reverse the engines. We were going under the jib and were ready to hoist the mainsail. We had gotten two lengths of the lighter beyond the stern of the Havana when the Metis began to whistle."

Figueroa, for libelants, was one of the crew of the General Prim. Among other things he says that he did not hear any signals before he left the side of the Havana. "When the collision was imminent she blew a whistle and reversed the engines." Both their witnesses say that the Metis was "going very fast at the time she struck the lighter," at "full speed." Every other witness contradicts them in this respect —no one of them puts her speed at more than three knots. Abbott says: "She was proceeding slow; say two or three knots—she was going at a slow speed." Pomares says: "We were proceeding at about two miles an hour." O'Brien says "three miles." Frederick says she was going slowly. She raised her anchor about 20 minutes, and had been moving about 10 minutes before the collision. The overwhelming weight of the evidence shows that the Metis was moving at from two to three miles an hour. Much stress is placed by libelants, upon the testimony of appellee's witnesses, taken at Norfolk, who were on the Metis, in respect to the time and character of the signals. Whitney, the first mate, describing the movement of the Metis from the time she raised her anchor until the collision, says:

That as he saw the lighter coming out from the port quarter of the Havana, about 50 feet from her, "with her head to the westward, and her jib set, the pilot blew his whistle, blew two whistles. * * * Then it was that he blew these whistles."

Walter Johnson, also on the Metis, saw the collision—says that the lighter came out from under the stern of the Havana, "heard the whistle of the Metis blow several times, two blasts." Linderman, on the Metis, says same. W. D. Henry, the master of the Metis, was on the bridge with the pilot and a man at the wheel. "The pilot did blow whistle, but how many times, I don't know."

The foregoing is substantially the testimony in regard to the signals given by the Metis. These witnesses gave, in a narrative form, an account of the movement of the two boats and what occurred immediately before and at the moment of the collision—no negligence had been suggested in the libels regarding the giving of signals. They all say that the whistle was blown immediately upon seeing the lighter come out from under the stern of the Havana. When the testimony of the pilot was taken he says: "We were going out with the steamer Metis; we were whistling with the usual precautions." Knowing that, at any moment, a launch might be expected to come out from the Havana, he says they whistled several times, "because it is customary to blow the whistle on going through any such channel"; that he blew "several

times because there was a good deal of traffic, and a lot of boats in the bay."

O'Brien says:

That his attention was drawn to the Metis, by hearing the "long whistle, the general alarm they blew for the pilot to come out. * * * The usual signal that is blown as a notice to lighters on the far side of the vessel is a long, single blast."

Abbott testifies that the Metis "was whistling as she came out. She was coming towards me; this was before the collision." Frederick corroborates this testimony. The testimony, as is usual in such cases, is capable of more than one interpretation, and from varying aspects sustains, with more or less force, different conclusions. It is not so much contradictory as it is fragmentary. The failure of the witnesses on the Metis, on their examination at Norfolk, to testify fully in regard to signals, is not necessarily, nor reasonably, construed contradictory of the testimony taken at Havana. Giving to the conclusion of the learned, experienced, and careful District Judge the weight to which it is entitled, and an examination of the testimony, found in the record, we are of the opinion that it should be sustained.

Passing to the other contentions made by the appellant in the brief, we note the criticism of the language of the District Judge:

"That the evidence seems undisputed that neither the General Prim, nor the Havana, whose cargo she was taking off, gave any signal to passing ships to indicate the General Prim's movements, and this neglect was what brought about the collision;"

—and the conclusion drawn by appellant therefrom that the judge exonerated the Metis because of the negligence of the steamer and the lighter, thus, as argued, violating the principle which entitles the owner of the cargo to full compensation from either of the ships in default. The Atlas, 93 U. S. 302, 23 L. Ed. 863. We think that counsel misconceived the meaning of the judge. He had clearly, in his opinion, announced his conclusion that the Metis was free from blame in any respect—in passing between the Cecilie and the Havana, in giving due and timely signals, or in using every precaution at her command to avoid the collision after she saw the General Prim come out from under the stern of the Havana. It was upon these conclusions that the decree, dismissing the libel, was based. The reference to the negligence of the Prim and the Havana was simply to give expression to the opinion of the judge that the collision was not the result of an "inevitable accident," but of the negligence of the other vessels. The decision in The Atlas, supra, sustains the position of appellants that the negligence of the General Prim is not imputed to the owners of the cargo, and that if both the Metis and the General Prim were negligent, the owners of the cargo are entitled to hold either or both responsible for the loss sustained. There is evidence of negligence on the part of the General Prim, but this does not avail the Metis, in this case, if she was likewise in default, unless the question raised by appellee that the negligence of the General Prim was the proximate cause of the collision exonerates her. In view of the conclusion reached by the District Judge this question is not presented.

Appellants, in their brief, concede that the Metis had the right to use the channel, conditioned upon her observance of the rules of navigation prevailing in the harbor of Havana. The overwhelming, almost uncontracted evidence is that the Metis was properly equipped—had a full crew and licensed pilot, all of whom were in their appropriate positions—that she was not moving at an excessive speed, and that she used every means possible after seeing the General Prim to prevent the collision. We concur with the conclusion reached by the District Judge.

Affirmed.